United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Filed October 9, 1998

 No. 98-3060

 In re: Bruce R. Lindsey (Grand Jury Testimony)

 Consolidated with

 Nos. 98-3062 & 98-3072

 ---------

 On Motion of President Clinton and the Office of the 
 President to Unseal the Sealed Portions of This 
 Court's Opinion and Related Pleadings

 ---------

 Before: Randolph, Rogers, and Tatel, Circuit Judges.

 O R D E R

 Upon consideration of the motion of President William 
Jefferson Clinton and the Office of the President, to unseal 
the sealed portions of this Court's opinion in In re: Bruce R. 
Lindsey (Grand Jury Testimony), 148 F.3d 1100 (D.C. Cir. 
1998), and the response of the United States of America, 
acting through the Office of the Independent Counsel, it is

 ORDERED, that the redacted portions of this Court's 
opinion in In re: Bruce R. Lindsey (Grand Jury Testimony), 
148 F.3d 1100 (D.C. Cir. 1998), are no longer protected from 
public disclosure by Rule 6(e), Fed. R. Crim. P., in view of the 

public release, by the House Committee on the Judiciary, of 
the Brief for Appellant William Jefferson Clinton, filed under 
seal in this Court, see In re Motions of Dow Jones & Co., 142 
F.3d 496, 505 (D.C. Cir. 1998); Appendix to the Referral to 
the United States House of Representatives, at 2157-2205 
(Sept. 18, 1998); and it is further
 ORDERED, pursuant to this Court's Local Rule 47.1(c), 
that the entire opinion of this Court, and the entire opinion 
concurring and dissenting, in In re: Bruce R. Lindsey 
(Grand Jury Testimony), 148 F.3d 1100 (D.C. Cir. 1998), 
shall be unsealed; and it is further
 ORDERED, for the same reason, that the following mate-
rials also shall be unsealed:

 1. Motion of the United States of America for Leave to 
File a Redacted Brief (June 23, 1998);

 2. Order of this Court to show cause why the briefs in this 
case should not be unsealed (June 24, 1998);

 3. Partial Opposition of Appellant William Jefferson Clin-
ton to the Motion of the Office of Independent Counsel for 
Leave to File a Redacted Brief (June 24, 1998);

 4. Response of the Office of the President to the Court's 
Order to Show Cause and the Office of the Independent 
Counsel's Motion for Leave to File a Redacted Brief (June 25, 
1998);

 5. Response to Order to Show Cause of Appellant William 
Jefferson Clinton (June 25, 1998);

 6. Response of the United States of America to June 24, 
1998, Show Cause Order Regarding Unsealing (June 25, 
1998);

 7. Unredacted Brief of Appellant the Office of the Presi-
dent (June 15, 1998);

 8. Unredacted Brief Amicus Curiae for the United States 
Acting Through the Attorney General (June 17, 1998);

 9. Unredacted Brief of Appellee the United States (June 
22, 1998);

 10. Unredacted Reply Brief of Appellant William Jeffer-
son Clinton (June 25, 1998);

 11. Unredacted Reply Brief of Appellant the Office of the 
President (June 25, 1998);

 12. Motion to Unseal, brought by President Clinton and 
the Office of the President (October 6, 1998);

 13. Response of the United States of America to Motion 
to Unseal (October 8, 1998);

 14. Response of Amicus Curiae the United States, Acting 
Through the Attorney General, to Motion to Unseal (October 
8, 1998).

 Per Curiam

 
United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued June 29, 1998 Decided July 27, 1998 

 No. 98-3060

 In re: Bruce R. Lindsey (Grand Jury Testimony)

 Consolidated with

 Nos. 98-3062 and 98-3072

 ---------

 Appeals from the United States District Court

 for the District of Columbia

 (No. 98ms00095)

 W. Neil Eggleston argued the cause for appellant the 
Office of the President, with whom Timothy K. Armstrong, 
Julie K. Brof and Charles F.C. Ruff, Counsel to the Presi-
dent, were on the briefs.

 David E. Kendall argued the cause for appellant William J. 
Clinton, with whom Nicole K. Seligman, Max Stier, Robert S. 
Bennett, Carl S. Rauh, Amy Sabrin and Katharine S. Sexton 
were on the briefs.

 Douglas N. Letter, Attorney, U.S. Department of Justice, 
argued the cause for amicus curiae the Attorney General, 

with whom Janet Reno, Attorney General, Frank W. Hunger, 
Assistant Attorney General, Stephen W. Preston, Deputy 
Assistant Attorney General, and Stephanie R. Marcus, Attor-
ney, were on the brief.

 Kenneth W. Starr, Independent Counsel and Brett M. 
Kavanaugh, Associate Independent Counsel, argued the 
causes for appellee the United States, with whom Joseph M. 
Ditkoff, Associate Independent Counsel, was on the brief.

 Before: Randolph, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed Per Curiam.

 Opinion dissenting from Part II and concurring in part and 
dissenting in part from Part III filed by Circuit Judge Tatel.

 Per Curiam: In these expedited appeals, the principal 
question is whether an attorney in the Office of the President, 
having been called before a federal grand jury, may refuse, 
on the basis of a government attorney-client privilege, to 
answer questions about possible criminal conduct by govern-
ment officials and others. To state the question is to suggest 
the answer, for the Office of the President is a part of the 
federal government, consisting of government employees do-
ing government business, and neither legal authority nor 
policy nor experience suggests that a federal government 
entity can maintain the ordinary common law attorney-client 
privilege to withhold information relating to a federal criminal 
offense. The Supreme Court and this court have held that 
even the constitutionally based executive privilege for presi-
dential communications fundamental to the operation of the 
government can be overcome upon a proper showing of need 
for the evidence in criminal trials and in grand jury proceed-
ings. See United States v. Nixon, 418 U.S. 683, 707-12 
(1974); In re Sealed Case (Espy), 121 F.3d 729, 736-38 (D.C. 
Cir. 1997). In the context of federal criminal investigations 
and trials, there is no basis for treating legal advice different-
ly from any other advice the Office of the President receives 
in performing its constitutional functions. The public interest 
in honest government and in exposing wrongdoing by govern-
ment officials, as well as the tradition and practice, acknowl-


edged by the Office of the President and by former White 
House Counsel, of government lawyers reporting evidence of 
federal criminal offenses whenever such evidence comes to 
them, lead to the conclusion that a government attorney may 
not invoke the attorney-client privilege in response to grand 
jury questions seeking information relating to the possible 
commission of a federal crime. The extent to which the 
communications of White House Counsel are privileged 
against disclosure to a federal grand jury depends, therefore, 
on whether the communications contain information of possi-
ble criminal offenses. Additional protection may flow from 
executive privilege and such common law privileges as may 
inhere in the relationship between White House Counsel and 
the President's personal counsel.

 I.

 On January 16, 1998, at the request of the Attorney 
General, the Division for the Purpose of Appointing Indepen-
dent Counsels issued an order expanding the prosecutorial 
jurisdiction of Independent Counsel Kenneth W. Starr. Pre-
viously, the main focus of Independent Counsel Starr's inqui-
ry had been on financial transactions involving President 
Clinton when he was Governor of Arkansas, known popularly 
as the Whitewater inquiry. The order now authorized Starr 
to investigate "whether Monica Lewinsky or others suborned 
perjury, obstructed justice, intimidated witnesses, or other-
wise violated federal law" in connection with the civil lawsuit 
against the President of the United States filed by Paula 
Jones. In re Motions of Dow Jones & Co., 142 F.3d 496, 497-
98 (D.C. Cir.) (quoting order). "Thereafter, a grand jury 
here began receiving evidence about Monica Lewinsky and 
President Clinton, and others...." Id. at 498.

 On January 30, 1998, the grand jury issued a subpoena to 
Bruce R. Lindsey, an attorney admitted to practice in Arkan-
sas. Lindsey currently holds two positions: Deputy White 
House Counsel and Assistant to the President. On February 


18, February 19, and March 12, 1998, Lindsey appeared 
before the grand jury and declined to answer certain ques-
tions on the ground that the questions represented informa-
tion protected from disclosure by a government attorney-
client privilege applicable to Lindsey's communications with 
the President as Deputy White House Counsel, as well as by 
executive privilege, and by the President's personal 
attorney-client privilege. Lindsey also claimed work product 
protections related to the attorney-client privileges.

 On March 6, 1998, the Independent Counsel moved to 
compel Lindsey's testimony. The district court granted that 
motion on May 4, 1998. The court concluded that the Presi-
dent's executive privilege claim failed in light of the Indepen-
dent Counsel's showing of need and unavailability. See In re 
Sealed Case (Espy), 121 F.3d at 754. It rejected Lindsey's 
government attorney-client privilege claim on similar 
grounds, ruling that the President possesses an attorney-
client privilege when consulting in his official capacity with 
White House Counsel, but that the privilege is qualified in the 
grand jury context and may be overcome upon a sufficient 
showing of need for the subpoenaed communications and 
unavailability from other sources. The court also ruled the 
President's personal attorney-client privilege and work prod-
uct immunity inapplicable to Lindsey's testimony. 

 Both the Office of the President and the President in his 
personal capacity appealed the order granting the motion to 
compel Lindsey's testimony, challenging the district court's 
construction of both the government attorney-client privilege 
and President Clinton's personal attorney-client privilege. 
The Independent Counsel then petitioned the Supreme Court 
to review the district court's decision on those issues, among 
others, before judgment by this court. On June 4, 1998, the 
Supreme Court denied certiorari, while indicating its expecta-
tion that "the Court of Appeals will proceed expeditiously to 
decide this case." United States v. Clinton, 118 S. Ct. 2079 
(1998). Following an expedited briefing schedule, on June 29, 
1998, this court heard argument on the attorney-client issues. 
Neither the Office of the President nor the President in his 
personal capacity has appealed the district court's ruling on 


executive privilege. In Part II we address the availability of 
the government attorney-client privilege; in Part III we 
address the President's personal attorney-client privilege 
claims.
 II.

 The attorney-client privilege protects confidential communi-
cations made between clients and their attorneys when the 
communications are for the purpose of securing legal advice 
or services. See In re Sealed Case, 737 F.2d 94, 98-99 (D.C. 
Cir. 1984). It "is one of the oldest recognized privileges for 
confidential communications." Swidler & Berlin v. United 
States, 118 S. Ct. 2081, 2084 (1998).

 The Office of the President contends that Lindsey's com-
munications with the President and others in the White 
House should fall within this privilege both because the 
President, like any private person, needs to communicate 
fully and frankly with his legal advisors, and because the 
current grand jury investigation may lead to impeachment 
proceedings, which would require a defense of the President's 
official position as head of the executive branch of govern-
ment, presumably with the assistance of White House Coun-
sel. The Independent Counsel contends that an absolute 
government attorney-client privilege would be inconsistent 
with the proper role of the government lawyer and that the 
President should rely only on his private lawyers for fully 
confidential counsel.

 Federal courts are given the authority to recognize privi-
lege claims by Rule 501 of the Federal Rules of Evidence, 
which provides that

 [e]xcept as otherwise required by the Constitution of the 
 United States or provided by Act of Congress or in rules 
 prescribed by the Supreme Court pursuant to statutory 
 authority, the privilege of a witness, person, government, 
 State, or political subdivision thereof shall be governed 
 by the principles of the common law as they may be 


 interpreted by the courts of the United States in the 
 light of reason and experience.

Fed. R. Evid. 501. Although Rule 501 manifests a congres-
sional desire to provide the courts with the flexibility to 
develop rules of privilege on a case-by-case basis, see Tram-
mel v. United States, 445 U.S. 40, 47 (1980), the Supreme 
Court has been "disinclined to exercise this authority expan-
sively," University of Pa. v. EEOC, 493 U.S. 182, 189 (1990). 
"[T]hese exceptions to the demand for every man's evidence 
are not lightly created nor expansively construed, for they are 
in derogation of the search for truth." Nixon, 418 U.S. at 
710; see also Trammel, 445 U.S. at 50. Consequently, feder-
al courts do not recognize evidentiary privileges unless doing 
so "promotes sufficiently important interests to outweigh the 
need for probative evidence." Id. at 51.

 The Supreme Court has not articulated a precise test to 
apply to the recognition of a privilege, but it has "placed 
considerable weight upon federal and state precedent," In re 
Sealed Case (Secret Service), 148 F.3d 1073, 1076 (D.C. Cir. 
1998), petition for cert. filed, 67 USLW 3083 (U.S. July 16, 
1998) (No. 98-93),and on the existence of "a 'public good 
transcending the normally predominant principle of utilizing 
all rational means for ascertaining the truth.' " Jaffee v. 
Redmond, 518 U.S. 1, 9 (1996) (quoting Trammel, 445 U.S. at 
50 (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) 
(Frankfurter, J., dissenting))). That public good should be 
shown "with a high degree of clarity and certainty." In re 
Sealed Case (Secret Service), at 1076.

 A.

 Courts, commentators, and government lawyers have long 
recognized a government attorney-client privilege in several 
contexts. Much of the law on this subject has developed in 
litigation about exemption five of the Freedom of Information 
Act ("FOIA"). See 5 U.S.C. s 552(b)(5) (1994). Under that 
exemption, "intra-agency memorandums or letters which 
would not be available by law to a party other than an agency 
in litigation with the agency" are excused from mandatory 
disclosure to the public. Id.; see also S. Rep. No. 89-813, at 2 

(1965) (including within exemption five "documents which 
would come within the attorney-client privilege if applied to 
private parties"). We have recognized that "Exemption 5 
protects, as a general rule, materials which would be protect-
ed under the attorney-client privilege." Coastal States Gas 
Corp. v. Department of Energy, 617 F.2d 854, 862 (D.C. Cir. 
1980). "In the governmental context, the 'client' may be the 
agency and the attorney may be an agency lawyer." Tax 
Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997); see also 
Brinton v. Department of State, 636 F.2d 600, 603-04 (D.C. 
Cir. 1980). In Lindsey's case, his client--to the extent he 
provided legal services--would be the Office of the Presi-
dent.1

 Exemption five does not itself create a government 
attorney-client privilege. Rather, "Congress intended that 
agencies should not lose the protection traditionally afforded 
through the evidentiary privileges simply because of the 
passage of the FOIA." Coastal States, 617 F.2d at 862. In 
discussing the government attorney-client privilege applicable 
to exemption five, we have mentioned the usual advantages:

 the attorney-client privilege has a proper role to play in 
 exemption five cases.... In order to ensure that a 
 client receives the best possible legal advice, based on a 
 full and frank discussion with his attorney, the attorney-
 client privilege assures him that confidential communica-
 tions to his attorney will not be disclosed without his 

__________
 1 Charles F.C. Ruff, the current White House Counsel, stated in 
an affidavit that he provides legal advice to the President regarding 
a wide variety of matters relating to his constitutional, statutory, 
ceremonial, and other official duties. He also provides legal advice 
to the President regarding the effective functioning of the Execu-
tive Branch. Lindsey's affidavit stated that the "White House 
Counsel's Office provides confidential counsel to the President in his 
official capacity, to the White House as an institution, and to senior 
advisors about legal matters that affect the White House's interests, 
including investigative matters. To this end, the Counsel's Office, 
in which I serve as Deputy, receives confidential communications 
from individuals about matters of institutional concern."


 consent. We see no reason why this same protection 
 should not be extended to an agency's communications 
 with its attorneys under exemption five.

Mead Data Cent., Inc. v. United States Dep't of Air Force, 
566 F.2d 242, 252 (D.C. Cir. 1977). Thus, when "the Govern-
ment is dealing with its attorneys as would any private party 
seeking advice to protect personal interests, and needs the 
same assurance of confidentiality so it will not be deterred 
from full and frank communications with its counselors," 
exemption five applies. Coastal States, 617 F.2d at 863.

 Furthermore, the proposed (but never enacted) Federal 
Rules of Evidence concerning privileges, to which courts have 
turned as evidence of common law practices, see, e.g., United 
States v. Gillock, 445 U.S. 360, 367-68 (1980); In re Bieter 
Co., 16 F.3d 929, 935 (8th Cir. 1994); Linde Thomson Lang-
worthy Kohn & Van Dyke v. Resolution Trust Corp., 5 F.3d 
1508, 1514 (D.C. Cir. 1993); United States v. (Under Seal), 
748 F.2d 871, 874 n.5 (4th Cir. 1984); United States v. 
Mackey, 405 F. Supp. 854, 858 (E.D.N.Y. 1975), recognized a 
place for a government attorney-client privilege. Proposed 
Rule 503 defined "client" for the purposes of the attorney-
client privilege to include "a person, public officer, or corpora-
tion, association, or other organization or entity, either public 
or private." Proposed Fed. R. Evid. 503(a)(1), reprinted in 56 
F.R.D. 183, 235 (1972). The commentary to the proposed 
rule explained that "[t]he definition of 'client' includes govern-
mental bodies." Id. advisory committee's note. The Restate-
ment also extends attorney-client privilege to government 
entities. See Restatement (Third) of the Law Governing 
Lawyers s 124 (Proposed Final Draft No. 1, 1996) [hereinaf-
ter Restatement].

 The practice of attorneys in the executive branch reflects 
the common understanding that a government attorney-client 
privilege functions in at least some contexts. The Office of 
Legal Counsel in the Department of Justice concluded in 1982 
that

 [a]lthough the attorney-client privilege traditionally has 
 been recognized in the context of private attorney-client 

 relationships, the privilege also functions to protect com-
 munications between government attorneys and client 
 agencies or departments, as evidenced by its inclusion in 
 the FOIA, much as it operates to protect attorney-client 
 communications in the private sector.

Theodore B. Olsen, Assistant Attorney General, Office of 
Legal Counsel, Confidentiality of the Attorney General's 
Communications in Counseling the President, 6 Op. Off. 
Legal Counsel 481, 495 (1982). The Office of Legal Counsel 
also concluded that when government attorneys stand in the 
shoes of private counsel, representing federal employees sued 
in their individual capacities, confidential communications be-
tween attorney and client are privileged. See Antonin Scalia, 
Assistant Attorney General, Office of Legal Counsel, Disclo-
sure of Confidential Information Received by U.S. Attorney 
in the Course of Representing a Federal Employee (Nov. 30, 
1976); Ralph W. Tarr, Acting Assistant Attorney General, 
Office of Legal Counsel, Duty of Government Lawyer Upon 
Receipt of Incriminating Information in the Course of an 
Attorney-Client Relationship with Another Government Em-
ployee (Mar. 29, 1985); see also 28 C.F.R. s 50.15(a)(3) 
(1998).

 B.

 Recognizing that a government attorney-client privilege 
exists is one thing. Finding that the Office of the President 
is entitled to assert it here is quite another.

 It is settled law that the party claiming the privilege bears 
the burden of proving that the communications are protected. 
As oft-cited definitions of the privilege make clear, only 
communications that seek "legal advice" from "a professional 
legal adviser in his capacity as such" are protected. See 8 
John Henry Wigmore, Evidence in Trials at Common Law 
s 2292, at 554 (McNaughton rev. 1961). Or, in a formulation 
we have adopted, the privilege applies only if the person to 
whom the communication was made is "a member of the bar 
of a court" who "in connection with th[e] communication is 
acting as a lawyer" and the communication was made "for the 


purpose of securing primarily either (i) an opinion on law or 
(ii) legal services or (iii) assistance in some legal proceeding." 
In re Sealed Case, 737 F.2d at 98-99 (quoting United States 
v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 
(D.Mass. 1950)).

 On the record before us, it seems likely that at least some 
of the conversations for which Lindsey asserted government 
attorney-client privilege did not come within the formulation 
just quoted. In its original opposition to the Independent 
Counsel's motion to compel Lindsey's testimony, the Office of 
the President claimed the privilege for conversations related 
to "providing legal advice on the questions whether the Office 
of the President should invoke its testimonial privileges, 
including the attorney-client and presidential communications 
privileges" and "possible impeachment proceedings before the 
House Judiciary Committee." White House Mem. in Opp'n 
to OIC's Mot. to Compel at 19. Both of these subjects arose 
from the expanded jurisdiction of the Independent Counsel, 
which did not become public until January 20, 1998. Before 
then, any legal advice Lindsey rendered in connection with 
Jones v. Clinton, a lawsuit involving President Clinton in his 
personal capacity, likely could not have been covered by 
government attorney-client privilege.2 Apparently realizing 
as much, the Office of the President added a third category in 
a supplemental filing: "Mr. Lindsey has also rendered advice 
to the Office of the President on how best to prevent other 
litigation in which the President is involved from hampering 
the Presidency's fulfillment of its institutional duties." White 
House Mem. Concerning President Clinton's Supplemental 
Filing in Supp. of Opp'n to Mot. to Compel at 2. We take 
notice that in describing this third subject, the word "advice" 
is not preceded by the word "legal." According to the 
Restatement, "consultation with one admitted to the bar but 
not in that other person's role as lawyer is not protected." 

__________
 2 We do not foreclose a showing by Lindsey when he appears 
again before the grand jury that prior to January 20, 1998, he gave 
legal advice as Deputy White House Counsel in regard to how 
private litigation involving the President was affecting the Office of 
the President.

Restatement s 122 cmt. c. "[W]here one consults an attor-
ney not as a lawyer but as a friend or as a business adviser or 
banker, or negotiator ... the consultation is not professional 
nor the statement privileged." 1 McCormick on Evidence 
s 88, at 322-24 (4th ed. 1992) (footnotes omitted). Thus 
Lindsey's advice on political, strategic, or policy issues, valu-
able as it may have been, would not be shielded from disclo-
sure by the attorney-client privilege.

 As for conversations after January 20th, the Office of the 
President must "present the underlying facts demonstrating 
the existence of the privilege" in order to carry its burden. 
See FTC v. Shaffner, 626 F.2d 32, 37 (7th Cir. 1980). A 
blanket assertion of the privilege will not suffice. Rather, 
"[t]he proponent must conclusively prove each element of the 
privilege." SEC v. Gulf & Western Indus., 518 F. Supp. 675, 
682 (D.D.C. 1981). In response to the Independent Counsel's 
questions, Lindsey invariably asserted executive privilege and 
attorney-client privilege. On this record, it is impossible to 
determine whether Lindsey believed that both privileges 
applied or whether he meant to invoke them on an "either/or" 
basis. As we have said, the district court's rejection of the 
executive privilege claim has not been appealed. With this 
privilege out of the picture, the Office of the President had to 
show that Lindsey's conversations "concerned the seeking of 
legal advice" and were between President Clinton and Lind-
sey or between others in the White House and Lindsey while 
Lindsey was "acting in his professional capacity" as an attor-
ney. Shaffner, 626 F.2d at 37.

 With regard to most of the communications that were the 
subject of questions before the grand jury, it does not appear 
to us that any such showing was made in the grand jury by 
Lindsey or in the district court by the Office of the President 
in the proceedings leading to the order to compel his testimo-
ny. This may be attributable to the parties' focus in the 
district court. The arguments on both sides centered on 
whether any attorney-client privilege protected the conversa-
tions about which Lindsey was asked, not on whether--if the 
privilege could be invoked--the conversations were covered 


by it. In light of this, and in view of the Administration's 
abandonment of its executive privilege claim, Lindsey would 
have to return to the grand jury no matter how we ruled on 
the government attorney-client privilege claim.

 There is, however, no good reason for withholding decision 
on the issues now before us. We have little doubt that at 
least one of Lindsey's conversations subject to grand jury 
questioning "concerned the seeking of legal advice" and was 
between President Clinton and Lindsey or between others in 
the White House and Lindsey while Lindsey was "acting in 
his professional capacity" as an attorney. See id. Before the 
grand jury, Lindsey spoke of many instances when legal 
advice would clearly have been appropriate, see Grand Jury 
Tr., Feb. 18, 1998, at 52-53, 90; Grand Jury Tr., Feb. 19, 
1998, at 54-55, 81-84, and he specifically affirmed that there 
were times when White House staff members came to him in 
his role as a member of the White House Counsel's Office, see 
id. at 64-74. Furthermore, there were times when Lindsey 
only invoked executive privilege, see, e.g., Grand Jury Tr., 
Feb. 18, 1998, at 115-16, at least implying that he invoked 
attorney-client privilege only when he thought it appropriate 
to do so. The issue whether the government attorney-client 
privilege could be invoked in these circumstances is therefore 
ripe for decision.

 Moreover, the case has been fully briefed and argued. The 
Supreme Court has asked us to expedite our disposition of 
these appeals. Sending this case back for still another round 
of grand jury testimony, assertions of privileges and immuni-
ties, a district court judgment, and then another appeal would 
be inconsistent with the Supreme Court's request and would 
do nothing but prolong the grand jury's investigation. The 
parties, we believe, are entitled now to a ruling to govern 
Lindsey's future grand jury appearance.

 We therefore turn to the question whether an attorney-
client privilege permits a government lawyer to withhold from 
a grand jury information relating to the commission of possi-
ble crimes by government officials and others. Although the 
cases decided under FOIA recognize a government attorney-

client privilege that is rather absolute in civil litigation, those 
cases do not necessarily control the application of the privi-
lege here. The grand jury, a constitutional body established 
in the Bill of Rights, "belongs to no branch of the institutional 
Government, serving as a kind of buffer or referee between 
the Government and the people," United States v. Williams, 
504 U.S. 36, 47 (1992), while the Independent Counsel is by 
statute an officer of the executive branch representing the 
United States. For matters within his jurisdiction, the Inde-
pendent Counsel acts in the role of the Attorney General as 
the country's chief law enforcement officer. See 28 U.S.C. 
s 594(a) (1994). Thus, although the traditional privilege be-
tween attorneys and clients shields private relationships from 
inquiry in either civil litigation or criminal prosecution, com-
peting values arise when the Office of the President resists 
demands for information from a federal grand jury and the 
nation's chief law enforcement officer. As the drafters of the 
Restatement recognized, "More particularized rules may be 
necessary where one agency of government claims the privi-
lege in resisting a demand for information by another. Such 
rules should take account of the complex considerations of 
governmental structure, tradition, and regulation that are 
involved." Restatement s 124 cmt. b. For these reasons, 
others have agreed that such "considerations" counsel against 
"expansion of the privilege to all governmental entities" in all 
cases. 24 Charles Alan Wright & Kenneth W. Graham, Jr., 
Federal Practice and Procedure s 5475, at 125 (1986).

 The question whether a government attorney-client privi-
lege applies in the federal grand jury context is one of first 
impression in this circuit, and the parties dispute the import 
of the lack of binding authority. The Office of the President 
contends that, upon recognizing a government attorney-client 
privilege, the court should find an exception in the grand jury 
context only if practice and policy require. To the contrary, 
the Independent Counsel contends, in essence, that the justi-
fication for any extension of a government attorney-client 
privilege to this context needs to be clear. These differences 
in approach are not simply semantical: they represent differ-
ent versions of what is the status quo. To argue about an 


"exception" presupposes that the privilege otherwise applies 
in the federal grand jury context; to argue about an "exten-
sion" presupposes the opposite. In Swidler & Berlin, the 
Supreme Court considered whether, as the Independent 
Counsel contended, it should create an exception to the 
personal attorney-client privilege allowing disclosure of confi-
dences after the client's death. See Swidler & Berlin, 118 
S. Ct. at 2083. After finding that the Independent Counsel 
was asking the Court "not simply to 'construe' the privilege, 
but to narrow it, contrary to the weight of the existing body 
of caselaw," the Court concluded that the Independent Coun-
sel had not made a sufficient showing to warrant the creation 
of such an exception to the settled rule. Id. at 2088.

 In the instant case, by contrast, there is no such existing 
body of caselaw upon which to rely and no clear principle that 
the government attorney-client privilege has as broad a scope 
as its personal counterpart. Because the "attorney-client 
privilege must be 'strictly confined within the narrowest 
possible limits consistent with the logic of its principle,' " In 
re Sealed Case, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982) 
(quoting In re Grand Jury Investigation, 599 F.2d 1224, 1235 
(3d Cir. 1979)); accord Trammel, 445 U.S. at 50, and because 
the government attorney-client privilege is not recognized in 
the same way as the personal attorney-client privilege ad-
dressed in Swidler & Berlin, we believe this case poses the 
question whether, in the first instance, the privilege extends 
as far as the Office of the President would like. In other 
words, pursuant to our authority and duty under Rule 501 of 
the Federal Rules of Evidence to interpret privileges "in light 
of reason and experience," Fed. R. Evid. 501, we view our 
exercise as one in defining the particular contours of the 
government attorney-client privilege.

 When an executive branch attorney is called before a 
federal grand jury to give evidence about alleged crimes 
within the executive branch, reason and experience, duty, and 
tradition dictate that the attorney shall provide that evidence. 
With respect to investigations of federal criminal offenses, 
and especially offenses committed by those in government, 
government attorneys stand in a far different position from 

members of the private bar. Their duty is not to defend 
clients against criminal charges and it is not to protect 
wrongdoers from public exposure. The constitutional respon-
sibility of the President, and all members of the Executive 
Branch, is to "take Care that the Laws be faithfully execut-
ed." U.S. Const. art. II, s 3. Investigation and prosecution 
of federal crimes is one of the most important and essential 
functions within that constitutional responsibility. Each of 
our Presidents has, in the words of the Constitution, sworn 
that he "will faithfully execute the Office of President of the 
United States, and will to the best of [his] Ability, preserve, 
protect and defend the Constitution of the United States." 
Id. art. II, s 1, cl. 8. And for more than two hundred years 
each officer of the Executive Branch has been bound by oath 
or affirmation to do the same. See id. art. VI, cl. 3; see also 
28 U.S.C. s 544 (1994). This is a solemn undertaking, a 
binding of the person to the cause of constitutional govern-
ment, an expression of the individual's allegiance to the 
principles embodied in that document. Unlike a private 
practitioner, the loyalties of a government lawyer therefore 
cannot and must not lie solely with his or her client agency.3

 The oath's significance is underscored by other evocations 
of the ethical duties of government lawyers.4 The Profession-

__________
 3 We recognize, as our dissenting colleague emphasizes, that 
every lawyer must take an oath to enter the bar of any court. But 
even after entering the bar, a government attorney must take 
another oath to enter into government service; that in itself shows 
the separate meaning of the government attorney's oath. More-
over, the oath is significant to our analysis only to the extent that it 
underlies the fundamental differences in the roles of government 
and private attorneys--of particular note, the fact that private 
attorneys cannot take official actions.

 4 Indeed, the responsibilities of government lawyers to the 
public have long governed the actions they can take on behalf of 
their "client":

 The United States Attorney is the representative not of an 
 ordinary party to a controversy, but of a sovereignty whose 
 obligation to govern impartially is as compelling as its obli-

al Ethics Committee of the Federal Bar Association has 
described the public trust of the federally employed lawyer as 
follows:

 [T]he government, over-all and in each of its parts, is 
 responsible to the people in our democracy with its 
 representative form of government. Each part of the 
 government has the obligation of carrying out, in the 
 public interest, its assigned responsibility in a manner 
 consistent with the Constitution, and the applicable laws 
 and regulations. In contrast, the private practitioner 
 represents the client's personal or private interest.... 
 [W]e do not suggest, however, that the public is the 
 client as the client concept is usually understood. It is to 
 say that the lawyer's employment requires him to ob-
 serve in the performance of his professional responsibili-
 ty the public interest sought to be served by the govern-
 mental organization of which he is a part.

Federal Bar Association Ethics Committee, The Government 
Client and Confidentiality: Opinion 73-1, 32 Fed. B.J. 71, 72 
(1973). Indeed, before an attorney in the Justice Department 
can step into the shoes of private counsel to represent a 
federal employee sued in his or her individual capacity, the 
Attorney General must determine whether the representation 
would be in the interest of the United States. See 28 C.F.R. 
s 50.15(a). The obligation of a government lawyer to uphold 
the public trust reposed in him or her strongly militates 
against allowing the client agency to invoke a privilege to 
prevent the lawyer from providing evidence of the possible 
commission of criminal offenses within the government. As 

__________
 gation to govern at all; and whose interest ... is not that it 
 shall win a case, but that justice shall be done.

Berger v. United States, 295 U.S. 78, 88 (1935). In keeping with 
these interests, prosecutors must disclose to the defendant exculpa-
tory evidence, see Brady v. Maryland, 373 U.S. 83, 87 (1963), and 
must try to "seek justice, not merely to convict," Model Code of 
Professional Responsibility EC 7-13 (1980). Similarly, the gov-
ernment lawyer in a civil action must "seek justice" and avoid unfair 
settlements or results. Id. EC 7-14.

Judge Weinstein put it, "[i]f there is wrongdoing in govern-
ment, it must be exposed.... [The government lawyer's] 
duty to the people, the law, and his own conscience requires 
disclosure...." Jack B. Weinstein, Some Ethical and Politi-
cal Problems of a Government Attorney, 18 Maine L. Rev. 
155, 160 (1966).

 This view of the proper allegiance of the government 
lawyer is complemented by the public's interest in uncovering 
illegality among its elected and appointed officials. While the 
President's constitutionally established role as superintendent 
of law enforcement provides one protection against wrongdo-
ing by federal government officials, see United States v. 
Valenzuela-Bernal, 458 U.S. 858, 863 (1982), another protec-
tion of the public interest is through having transparent and 
accountable government.5 As James Madison observed,

 [a] popular Government, without popular information, or 
 the means of acquiring it, is but a Prologue to a Farce or 
 a Tragedy; or, perhaps both. Knowledge will forever 
 govern ignorance: And a people who mean to be their 
 own Governors, must arm themselves with the power 
 which knowledge gives.

Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 
9 The Writings of James Madison 103 (Gaillard Hunt ed., 
1910). This court has accordingly recognized that "openness 
in government has always been thought crucial to ensuring 
that the people remain in control of their government." In re 
Sealed Case (Espy), 121 F.3d at 749. Privileges work against 
these interests because their recognition "creates the risk 
that a broad array of materials in many areas of the executive 
branch will become 'sequester[ed]' from public view." Id. 
(quoting Wolfe v. Department of Health & Human Servs., 815 
F.2d 1527, 1533 (D.C. Cir. 1987)). Furthermore, "to allow 
any part of the federal government to use its in-house attor-

__________
 5 Congress has clearly indicated, as a matter of policy, that 
federal employees should not withhold information relating to possi-
ble criminal misconduct by federal employees on any basis. We 
discuss at more length Congress's recognition of these concerns 
below in our discussion of 28 U.S.C. s 535(b).

neys as a shield against the production of information rele-
vant to a federal criminal investigation would represent a 
gross misuse of public assets." In re Grand Jury Subpoena 
Duces Tecum, 112 F.3d 910, 921 (8th Cir.), cert. denied, 117 
S.Ct. 2482 (1997).

 Examination of the practice of government attorneys fur-
ther supports the conclusion that a government attorney, 
even one holding the title Deputy White House Counsel, may 
not assert an attorney-client privilege before a federal grand 
jury if communications with the client contain information 
pertinent to possible criminal violations. The Office of the 
President has traditionally adhered to the precepts of 28 
U.S.C. s 535(b), which provides that

 [a]ny information ... received in a department or agency 
 of the executive branch of the Government relating to 
 violations of title 18 involving Government officers and 
 employees shall be expeditiously reported to the Attor-
 ney General.

28 U.S.C. s 535(b) (1994). We need not decide whether 
section 535(b) alone requires White House Counsel to testify 
before a grand jury.6 The statute does not clearly apply to 
the Office of the President. The Office is neither a "depart-
ment," as that term is defined by the statute, see 5 U.S.C. 
s 101 (1994); 28 U.S.C. s 451 (1994); Haddon v. Walters, 43 
F.3d 1488, 1490 (D.C. Cir. 1995) (per curiam), nor an "agen-
cy," see Kissinger v. Reporters Comm. for Freedom of the 
Press, 445 U.S. 136, 156 (1980) (FOIA case); see also Arm-
strong v. Executive Office of the President, 1 F.3d 1274, 1295 

__________
 6 28 U.S.C. s 535(a) authorizes the Attorney General to "investi-
gate any violation of title 18 [the federal criminal code] involving 
Government officers and employees." The Independent Counsel 
fills the shoes of the Attorney General in this regard because 
Congress has given the Independent Counsel "with respect to all 
matters in [his] prosecutorial jurisdiction ... full power and inde-
pendent authority to exercise all investigative and prosecutorial 
functions and powers of ... the Attorney General." 28 U.S.C. 
s 594(a); see In re Sealed Case (Secret Service), 148 F.3d at 1078.


(D.C. Cir. 1993) (per curiam); National Sec. Archive v. 
Archivist of the United States, 909 F.2d 541, 545 (D.C. Cir. 
1990) (per curiam). However, at the very least "[section] 
535(b) evinces a strong congressional policy that executive 
branch employees must report information" relating to viola-
tions of Title 18, the federal criminal code. In re Sealed Case 
(Secret Service), 148 F.3d at 1078. As the House Committee 
Report accompanying section 535 explains, "[t]he purpose" of 
the provision is to "require the reporting by the departments 
and agencies of the executive branch to the Attorney General 
of information coming to their attention concerning any al-
leged irregularities on the part of officers and employees of 
the Government." H.R. Rep. No. 83-2622, at 1 (1954). Sec-
tion 535(b) suggests that all government employees, including 
lawyers, are duty-bound not to withhold evidence of federal 
crimes.

 Furthermore, government officials holding top legal posi-
tions have concluded, in light of section 535(b), that White 
House lawyers cannot keep evidence of crimes committed by 
government officials to themselves. In a speech delivered 
after the Kissinger FOIA case was handed down, Lloyd 
Cutler, who served as White House Counsel in the Carter and 
Clinton Administrations, discussed the "rule of making it your 
duty, if you're a Government official as we as lawyers are, a 
statutory duty to report to the Attorney General any evidence 
you run into of a possible violation of a criminal statute." 
Lloyd N. Cutler, The Role of the Counsel to the President of 
the United States, 35 Record of the Ass'n of the Bar of the 
City of New York No. 8, at 470, 472 (1980). Accordingly, 
"[w]hen you hear of a charge and you talk to someone in the 
White House ... about some allegation of misconduct, almost 
the first thing you have to say is, 'I really want to know about 
this, but anything you tell me I'll have to report to the 
Attorney General.' " Id. Similarly, during the Nixon admin-
istration, Solicitor General Robert H. Bork told an adminis-
tration official who invited him to join the President's legal 
defense team: "A government attorney is sworn to uphold 
the Constitution. If I come across evidence that is bad for 
the President, I'll have to turn it over. I won't be able to sit 


on it like a private defense attorney." A Conversation with 
Robert Bork, D.C. Bar Rep., Dec. 1997-Jan. 1998, at 9.

 The Clinton Administration itself endorsed this view as 
recently as a year ago. In the proceedings leading to the 
Supreme Court's denial of certiorari with regard to the 
Eighth Circuit's decision in In re Grand Jury Subpoena 
Duces Tecum, the Office of the President assured the Su-
preme Court that it "embraces the principles embodied in 
Section 535(b)" and acknowledged that "the Office of the 
President has a duty, recognized in official policy and prac-
tice, to turn over evidence of the crime." Reply Brief for 
Office of the President at 7, Office of the President v. Office of 
Independent Counsel, 117 S. Ct. 2482 (1997) (No. 96-1783). 
The Office of the President further represented that "on 
various occasions" it had "referred information to the 
Attorney General reflecting the possible commission of a 
criminal offense--including information otherwise protected 
by attorney-client privilege." Id. At oral argument, counsel 
for the Office of the President reiterated this position. In 
addition, the White House report on possible misdeeds relat-
ing to the White House Travel Office stated that "[i]f there is 
a reasonable suspicion of a crime ... about which White 
House personnel may have knowledge, the initial communica-
tion of this information should be made to the Attorney 
General, the Deputy Attorney General, or the Associate At-
torney General." White House Travel Office Management 
Review 23 (1993).

 We are not aware of any previous deviation from this 
understanding of the role of government counsel. We know 
that Nixon White House Counsel Fred Buzhardt testified 
before the Watergate grand jury without invoking attorney-
client privilege, although not much may be made of this.7 See 
Anthony Ripley, Milk Producers' Group Fined $5,000 for 
Nixon Gifts, N.Y. Times, May 7, 1974, at 38. On the other 
hand, the Office of the President points out that C. Boyden 

__________
 7 President Nixon waived executive privilege and attorney-client 
privilege before the grand jury. See Special Prosecution Force, 
Watergate Report 88 (1975) [hereinafter Watergate Report].

Gray, White House Counsel during the Bush Administration, 
and his deputy, John Schmitz, refused to be interviewed by 
the Independent Counsel investigating the Iran-Contra affair 
and only produced documents subject to an agreement that 
"any privilege against disclosure ... including the attorney-
client privilege" was not waived. 1 Lawrence E. Walsh, 
Final Report of the Independent Counsel for Iran/Contra 
Matters 478-79 & n.52 (1993). However, the Independent 
Counsel in that investigation had not subpoenaed Gray or 
Schmitz to testify before a grand jury, and there is no 
indication that the information sought from them constituted 
evidence of any criminal offense. Independent Counsel 
Walsh apparently sought to question these individuals merely 
to complete his final report. See id. In any event, even 
outside the grand jury context, the general practice of gov-
ernment counsel has been to cooperate with the investigations 
of independent counsels. For example, Peter Wallison, White 
House Counsel under President Reagan, produced his diary 
for the Iran-Contra investigation and cooperated in other 
ways. See id. at 44, 470 n.137, 517, 520. Other government 
attorneys both produced documents and agreed to be inter-
viewed for that investigation. See id. at 346-48, 366-68, 536 
& nn.116-17, 537.

 The Office of the President asserts two principal contribu-
tions to the public good that would come from a government 
attorney's withholding evidence from a grand jury on the 
basis of an attorney-client privilege. First, it maintains that 
the values of candor and frank communications that the 
privilege embodies in every context would apply to Lindsey's 
communications with the President and others in the White 
House. Government officials, the Office of the President 
claims, need accurate advice from government attorneys as 
much as private individuals do, but they will be inclined to 
discuss their legal problems honestly with their attorneys 
only if they know that their communications will be confiden-
tial.

 We may assume that if the government attorney-client 
privilege does not apply in certain contexts this may chill 
some communications between government officials and gov-


ernment lawyers. Even so, government officials will still 
enjoy the benefit of fully confidential communications with 
their attorneys unless the communications reveal information 
relating to possible criminal wrongdoing. And although the 
privacy of these communications may not be absolute before 
the grand jury, the Supreme Court has not been troubled by 
the potential chill on executive communications due to the 
qualified nature of executive privilege.8 Compare Nixon, 418 
U.S. at 712-13 (discounting the chilling effects of the qualifi-
cation of the presidential communications privilege on the 
candor of conversations), with Swidler & Berlin, 118 S. Ct. at 
2087 (stating, in the personal attorney-client privilege context, 
that an uncertain privilege is often no better than no privilege 
at all). Because both the Deputy White House Counsel and 
the Independent Counsel occupy positions within the federal 
government, their situation is somewhat comparable to that of 
corporate officers who seek to keep their communications 
with company attorneys confidential from each other and 
from the shareholders. Under the widely followed doctrine 
announced in Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 
1970), corporate officers are not always entitled to assert such 
privileges against interests within the corporation, and ac-
cordingly must consult with company attorneys aware that 
their communications may not be kept confidential from 
shareholders in litigation. See id. at 1101. Any chill on 
candid communications with government counsel flowing from 
our decision not to extend an absolute attorney-client privi-
lege to the grand jury context is both comparable and similar-
ly acceptable.

 Moreover, nothing prevents government officials who seek 
completely confidential communications with attorneys from 
consulting personal counsel. The President has retained 
several private lawyers, and he is entitled to engage in the 
completely confidential communications with those lawyers 
befitting an attorney and a client in a private relationship. 
See infra Part III.

__________
 8 We do not address privilege exceptions relating to military 
secrets or other exempted communications.


 The Office of the President contends that White House 
Counsel's role in preparing for any future impeachment pro-
ceedings alters the policy analysis.9 The Ethics in Govern-
ment Act requires the Independent Counsel to "advise the 
House of Representatives of any substantial and credible 
information ... that may constitute grounds for an impeach-
ment." 28 U.S.C. s 595(c) (1994). In November 1997, a 
Congressman introduced a resolution in the House of Repre-
sentatives calling for an inquiry into possible grounds for 
impeachment of the President. See H.R. Res. 304, 105th 
Cong. (1997). Thus, to the extent that impeachment proceed-
ings may be on the horizon, the Office of the President 
contends that White House Counsel must be given maximum 
protection against grand jury inquiries regarding their efforts 
to protect the Office of the President, and the President in his 
personal capacity, against impeachment. Additionally, the 
Office of the President notes that the Independent Counsel 
serves as a conduit to Congress for information concerning 
grounds for impeachment obtained by the grand jury, and, 
consequently, an exception to the attorney-client privilege 
before the grand jury will effectively abrogate any absolute 
privilege those communications might otherwise enjoy in fu-
ture congressional investigations and impeachment hearings.

 Although the Independent Counsel and the Office of the 
President agree that White House Counsel can represent the 
President in the impeachment process, the precise contours of 
Counsel's role are far from settled.10 In any event, no matter 

__________
 9 The district court did not rule upon this argument, and hence 
we lack the benefit of that court's thinking in addition to a complete 
record on the nature, scope, and content of communications be-
tween the President and Deputy White House Counsel with regard 
to the impeachment issue. See Gilda Marx, Inc. v. Wildwood 
Exercise, Inc., 85 F.3d 675, 679 (D.C. Cir. 1996) (per curiam).

 10 While a prior Comptroller General has thought that White 
House Counsel could properly be paid out of federal funds for 
representing the President in matters leading up to an impeach-
ment, see Letter from Elmer B. Staats, U.S. Comptroller General, 
to Rep. John F. Seiberling 7 (Oct. 25, 1974), history yields little 
guidance on the role that White House Counsel would properly play 

what the role should be, impeachment is fundamentally a 
political exercise. See The Federalist No. 65 (Alexander 
Hamilton); Joseph Story, Commentaries on the Constitution 
s 764, at 559 (5th ed. 1905). Impeachment proceedings in the 
House of Representatives cannot be analogized to traditional 
legal processes and even the procedures used by the Senate 
in "trying" an impeachment may not be like those in a judicial 
trial. See (Walter) Nixon v. United States, 506 U.S. 224, 228-
31 (1993); Story, Commentaries on the Constitution s 765, at 
559-60. How the policy and practice supporting the common 
law attorney-client privilege would apply in such a political 
context thus is uncertain. In preparing for the eventuality of 
impeachment proceedings, a White House Counsel in effect 
serves the President as a political advisor, albeit one with 
legal expertise: to wit, Lindsey occupies a dual position as an 
Assistant to the President and a Deputy White House Coun-
sel. Thus, information gathered in preparation for impeach-
ment proceedings and conversations regarding strategy are 
presumably covered by executive, not attorney-client, privi-
lege. While the need for secrecy might arguably be greater 
under these circumstances, the district court's ruling on 
executive privilege is not before us. In addition, in respond-
ing to the grand jury investigation and gathering information 
in preparation for future developments in accordance with his 
official duties, White House Counsel may need to interact 

__________
in impeachment proceedings. The only President impeached by the 
House and tried by the Senate, Andrew Johnson, retained private 
counsel, and his Attorney General resigned from office in order to 
assist in his defense. See William H. Rehnquist, Grand Inquests 
222 (1992). In contrast, after the House Judiciary Committee 
began an impeachment inquiry into the Watergate scandal, Presi-
dent Richard Nixon appointed James D. St. Clair as a special 
counsel to the President for Watergate-related matters. See Wa-
tergate Report 103. Although Nixon resigned before the House of 
Representatives voted on any articles of impeachment, St. Clair 
handled much of the President's defense until the President's 
resignation. See id. at 103-15. At the very least, nothing prevents 
a President faced with impeachment from retaining private counsel, 
and in turn this makes less clear what might be the division of labor 
between White House Counsel and private counsel.


with the President's private attorneys, and to that extent 
other privileges may be implicated. See infra Part III.

 Nor is our conclusion altered by the Office of the Presi-
dent's concern over the possibility that Independent Counsel 
will convey otherwise privileged grand jury testimony of 
White House Counsel to Congress.11 Cf. Fed. R. Crim. P. 6(e). 
First, no one can say with certainty the extent to which a 
privilege would generally protect a White House Counsel 
from testifying at a congressional hearing. The issue is not 
presently before the court.12 See Nixon, 418 U.S. at 712 n.19; 
In re Sealed Case (Espy), 121 F.3d at 739 nn.9-10, 753. 
Second, the particular procedures and evidentiary rules to be 
employed by the House and Senate in any future impeach-
ment proceedings remain entirely speculative. Finally, 
whether Congress can abrogate otherwise recognized privi-
leges in the course of impeachment proceedings may well 
constitute a nonjusticiable political question. See (Walter) 
Nixon, 506 U.S. at 236.

 The Supreme Court's recognition in United States v. Nixon 
of a qualified privilege for executive communications severely 
undercuts the argument of the Office of the President regard-
ing the scope of the government attorney-client privilege. A 
President often has private conversations with his Vice Presi-
dent or his Cabinet Secretaries or other members of the 

__________
 11 Contrary to the Office of the President's suggestion, this is 
not a novel concern stemming from the Ethics in Government Act. 
During initial discussions with the Watergate Special Prosecutor, 
"[James] St. Clair was primarily concerned that evidence produced 
for the grand jury not subsequently be provided by [the Special 
Prosecutor] to the House Judiciary Committee for use in its im-
peachment inquiry." Watergate Report 104-05. The Special 
Prosecutor eventually asked the grand jury to transmit an "eviden-
tiary report" to the House Committee considering President Nix-
on's impeachment. Id. at 143.

 12 The Office of the President cites no authority for the proposi-
tion that communications between White House Counsel and the 
President would be absolutely privileged in congressional proceed-
ings, but rather merely suggests that they "should" be.

Administration who are not lawyers or who are lawyers, but 
are not providing legal services. The advice these officials 
give the President is of vital importance to the security and 
prosperity of the nation, and to the President's discharge of 
his constitutional duties. Yet upon a proper showing, such 
conversations must be revealed in federal criminal proceed-
ings. See Nixon, 418 U.S. at 713; In re Sealed Case (Espy), 
121 F.3d at 745. Only a certain conceit among those admit-
ted to the bar could explain why legal advice should be on a 
higher plane than advice about policy, or politics, or why a 
President's conversation with the most junior lawyer in the 
White House Counsel's Office is deserving of more protection 
from disclosure in a grand jury investigation than a Presi-
dent's discussions with his Vice President or a Cabinet Secre-
tary. In short, we do not believe that lawyers are more 
important to the operations of government than all other 
officials, or that the advice lawyers render is more crucial to 
the functioning of the Presidency than the advice coming 
from all other quarters.

 The district court held that a government attorney-client 
privilege existed and was applicable to grand jury proceed-
ings, but could be overcome, as could an applicable executive 
privilege, upon a showing of need and unavailability else-
where by the Independent Counsel. While we conclude that 
an attorney-client privilege may not be asserted by Lindsey 
to avoid responding to the grand jury if he possesses informa-
tion relating to possible criminal violations, he continues to be 
covered by the executive privilege to the same extent as the 
President's other advisers. Our analysis, in addition to hav-
ing the advantages mentioned above, avoids the application of 
balancing tests to the attorney-client privilege--a practice 
recently criticized by the Supreme Court. See Swidler & 
Berlin, 118 S. Ct. at 2087.

 In sum, it would be contrary to tradition, common under-
standing, and our governmental system for the attorney-
client privilege to attach to White House Counsel in the same 
manner as private counsel. When government attorneys 
learn, through communications with their clients, of informa-
tion related to criminal misconduct, they may not rely on the 


government attorney-client privilege to shield such informa-
tion from disclosure to a grand jury.

 III.

 The Independent Counsel does not contest that the Presi-
dent is entitled in his personal capacity to the same privileges 
as any person, and thus that he receives the full protection of 
the attorney-client and work product privileges in his dealings 
with personal counsel. Although, according to the Presi-
dent's brief, Lindsey has not served as the President's private 
counsel since 1993, the President maintains under two theo-
ries, each rejected by the district court, that some information 
that Lindsey has obtained during his tenure as a Deputy 
White House Counsel may nonetheless be protected under 
the President's personal attorney-client and work product 
privileges. First, under the "intermediary" doctrine, the 
President contends that his personal attorney-client privilege 
covers those instances when Lindsey acted as his agent to 
assist him in conveying information and instructions to his 
private counsel and securing information and advice in return. 
Second, under the "common interest" doctrine, the President 
contends that his attorney-client privilege covers instances in 
which he and his private counsel conferred with Lindsey 
about matters in which the President in his personal capacity 
had an overlapping concern with Lindsey's client--the Presi-
dent in his official capacity. Although both these contentions 
seem at first to conflict with the rationales underlying our 
conclusion that there is no government attorney-client privi-
lege before a federal grand jury, in light of the deference due 
to the President about how best to maintain effective commu-
nication with his private counsel, we agree that Lindsey can 
act as an intermediary. However, because Lindsey is a 
government official, the common interest doctrine cannot 
apply to shield evidence of possible criminal misconduct from 
the grand jury.

 A.

 The President first contends that his personal attorney-
client privilege allows Lindsey to refuse to disclose informa-

tion obtained while serving as an intermediary between the 
President and his private counsel. Although the district 
court recognized that the attorney-client privilege sometimes 
covers communications between an attorney and a client 
made through an agent, see Restatement s 120, the court 
ruled that the privilege did not cover communications made 
through Lindsey for three reasons: first, it was unpersuaded 
that the President needed to use an intermediary; second, it 
found that Lindsey was not actually used as an intermediary; 
and third, it was unsure that the use of a government 
attorney as an intermediary would ever be proper. We are 
satisfied that no greater showing of need was required for the 
President to use Lindsey as an intermediary and, thus, 
information Lindsey may have learned when he was, in fact, 
acting merely as an intermediary falls within the President's 
personal attorney-client privilege.

 Although the district court found (and the Independent 
Counsel does not contest) both that Lindsey served as the 
President's agent and that the official duties of the President 
may make him unavailable to his private counsel, it gave little 
credence to the insistence of Robert S. Bennett, one of the 
President's personal attorneys in the Jones litigation, that 
Lindsey, one of the President's closest advisers and his 
common travel companion, often provided the most expedi-
tious way to contact the President. The district court de-
murred:

 It is not clear to the Court why Bennett could not also 
 call the President at a convenient time if Lindsey could 
 do so or why someone at the White House could not 
 connect them so that they could speak to each other.... 
 In the situation described to the Court, it is unclear why 
 Lindsey was a necessary intermediary.

The district court placed considerable weight in a concession 
by another of the President's private counsel that the attor-
neys representing him in the Whitewater matters had not to 
that point needed to use Lindsey as an intermediary, al-
though that counsel emphasized that, unlike counsel in the 
Jones litigation, her firm had not to that point "had the 


immediacy of the civil litigation" and in such an eventuality 
might later need Lindsey's intermediary services.

 The parties dispute whether the use of an agent for com-
munication between the attorney and the client must be 
"reasonably necessary" in order for that agent to fall within 
the attorney-client privilege, as the Independent Counsel 
urges, or whether the privilege can cover any agent used for 
securing legal advice regardless of the client's need for the 
agent, as the President contends.13 But even if we assume 
that the Independent Counsel is correct, the district court 
erred in ruling that the President's use of Lindsey as an 
intermediary was not reasonably necessary. In applying the 
standard of "reasonable necessity," one must necessarily take 
into account the client's circumstances and the obstacles 
preventing direct communication with the attorney. What is 
reasonable to expect of an ordinary client may not be reason-
able to expect of the President of the United States. Al-
though the Independent Counsel emphasizes that the typical 
case in which the intermediary doctrine has been held to 
apply involves the client's fundamental inability to communi-
cate without an intermediary rather than the client's busy 
schedule and general inaccessibility, see, e.g., Hendrick v. 
Avis Rent A Car Sys., 944 F. Supp. 187, 189 (W.D.N.Y. 1996) 
(paralyzed client); State v. Aquino-Cervantes, 945 P.2d 767, 
771-72 (Wash. Ct.App. 1997) (client requiring translator), that 
distinction is not dispositive here. When the client is the 
President, the standard of "reasonable necessity" must ac-
commodate the unavoidable, virtually full-time demands of 
the office. Moreover, the court would be remiss not to heed 
the Supreme Court's instructions in Clinton v. Jones, 117 
S. Ct. 1636 (1997), that "[t]he high respect that is owed to the 
office of the Chief Executive ... is a matter that should 
inform the conduct of the entire proceeding," id. at 1650-51, 

__________
 13 Compare Proposed Fed. R. Evid. 503(a)(4), reprinted in 56 
F.R.D. at 236 (requiring that the use of an intermediary be "reason-
ably necessary"); Restatement s 120 cmt. f (same), with 1 McCor-
mick on Evidence s 91 (4th ed. 1992) (finding it irrelevant whether 
the use of the intermediary was "reasonably necessary"); 3 Wein-
stein's Federal Evidence s 503 (2d ed. 1997) (same).

and that there is a tradition of federal courts' affording "the 
utmost deference to Presidential responsibilities," id. at 1652 
(quoting Nixon, 418 U.S. at 710-11) (internal quotation marks 
omitted). In light of these considerations, we decline to 
second-guess the President's decision to use Lindsey as an 
intermediary in order to avoid undue disruptions to the 
President's ability to carry out his official responsibilities. So 
viewed, the designation of Lindsey as an intermediary was at 
least reasonably necessary and, thus, while acting in this 
capacity his communications came within the President's per-
sonal attorney-client privilege. Cf. FTC v. TRW, Inc., 628 
F.2d 207, 212 (D.C. Cir. 1980).

 There is a further question, however, when if ever Lindsey 
actually was acting as an intermediary. The district court 
found that regardless of whether an intermediary was neces-
sary, Lindsey went beyond merely transmitting information 
to "consulting with Bennett regarding litigation strategy and 
describing his past representation of President Clinton to 
Bennett." Relying on United States v. Kovel, 296 F.2d 918 
(2d Cir. 1961), the President contends that Lindsey qualified 
under the intermediary doctrine even when he was not acting 
in a purely ministerial role. In Kovel, the Second Circuit 
refused to confine the scope of the doctrine to menial or 
ministerial employees, for the court could identify

 no significant difference between a case where the attor-
 ney sends a client speaking a foreign language to an 
 interpreter to make a literal translation of the client's 
 story ... and a [case] where the attorney, ignorant of 
 the foreign language, sends the client to a non-lawyer 
 proficient in it, with instructions to interview the client 
 on the attorney's behalf and then render his own sum-
 mary of the situation, perhaps drawing on his own knowl-
 edge in the process, so that the attorney can give the 
 client proper legal advice.

Id. at 921. Thus, the President contends that Lindsey did 
not overstep his role as an intermediary when adding insight 
and information to the communications between the President 
and his private counsel.


 In considering whether a client's communication with his or 
her lawyer through an agent is privileged under the interme-
diary doctrine, the "critical factor" is "that the communication 
be made 'in confidence for the purpose of obtaining legal 
advice from the lawyer.' " Linde Thomson, 5 F.3d at 1514 
(emphasis removed) (quoting TRW, 628 F.2d at 212). When 
an agent changes a message in a way not intended simply to 
ensure complete understanding (as in the case of a transla-
tor), the agent is not acting consistently with this purpose; by 
changing the message, the agent injects himself or herself 
into the chain of communication, rather than effectuating the 
client's purpose of receiving advice from his or her lawyer.

 It is true that courts have held the intermediary doctrine 
applicable to agents who have added value to attorney-client 
communications, see, e.g., United States v. Judson, 322 F.2d 
460, 462-63 (9th Cir. 1963); Miller v. Haulmark Transp. 
Sys., 104 F.R.D. 442, 445 (E.D. Pa. 1984), and we have no 
quarrel with the general proposition that intermediaries may 
add value. Clearly, for instance, a translator adds value to 
the interaction between the attorney and the client, as does 
an accountant who digests the client's financial information 
and puts it into a form useable by the attorney. See TRW, 
628 F.2d at 212 (noting that an accountant could be covered 
by the intermediary doctrine only when acting to "put[] the 
client's information into terms that the attorney can use 
effectively"). There are limits, though, and the district court 
correctly observed that the intermediary doctrine would not 
cover instances when Lindsey consulted with the President's 
private counsel on litigation strategy. The "attorney-client 
privilege must be 'strictly confined within the narrowest 
possible limits consistent with the logic of its principle,' " In 
re Sealed Case, 676 F.2d at 807 n.14 (quoting In re Grand 
Jury Investigation, 599 F.2d at 1235), and "[w]ithout ... 
limitations [on the protection accorded the work of third 
persons], the attorney-client privilege would engulf all man-
ner of services performed for the lawyer that are not now, 
and should not be, summarily excluded from the adversary 
process," TRW, 628 F.2d at 212. It would stretch the inter-
mediary doctrine beyond the logic of its principle to include 


Lindsey's legal contributions as an extra lawyer, and we 
decline to do so.14 Those contributions, rather than facilitat-
ing the representation of the President's personal counsel, 
constitute Lindsey's own independent contribution to the 
President's cause and cannot therefore be said to be covered 
by the intermediary doctrine. One lawyer does not need 
another lawyer providing supplementary legal advice to facili-
tate communication regarding matters of legal strategy.

 The record does not show, however, that Lindsey never 
acted as a mere intermediary. In a declaration filed in the 
district court, Lindsey described his role as an intermediary 
thus: "Typically, when the President's private lawyers need 
information in connection with the Jones lawsuit, they tele-
phone me with questions for the President. I present ques-
tions to the President at opportune times, and later relay the 
President's answers back to private counsel." That Lindsey 
may have on occasion consulted with Bennett on legal strate-
gy does not mean that Lindsey could not claim the protection 
of the intermediary doctrine for those instances in which he 

__________
 14 Of course, one unable to win protection through the interme-
diary doctrine still might be able to claim the client's attorney-client 
privilege through a different route. The President maintains, for 
instance, that conversations between his private counsel and Lind-
sey are privileged to the extent that such conversations related to 
Lindsey's prior private representation of then-Governor Clinton. 
The present record is, however, inadequate for us to conclude what 
subjects may have been encompassed within Lindsey's prior private 
representation of Governor Clinton and whether Lindsey will be 
asked to testify before the grand jury about matters relating to the 
prior private representation. Although Lindsey might still assert 
attorney-client privilege as to information he learned while serving 
as the Governor's private counsel, regardless of whether he subse-
quently communicated such information to the President's current 
private counsel, see Restatement s 45(2) & cmt. b, we decline to 
consider whether and to what extent Lindsey may assert attorney-
client privilege for conversations he had while serving as Deputy 
White House Counsel regarding subjects that only relate to the 
prior private representation of the Governor. That question re-
mains open for consideration by the district court upon request of 
the parties. See id. s 111 & cmt. c.

did act as an intermediary. As the district court properly 
acknowledged, "most of Lindsey's assistance was not as an 
intermediary relaying messages between the President's pri-
vate attorneys and the President himself." Upon remand, 
the district court should address when, if ever, Lindsey was 
acting as a true intermediary and allow him to claim the 
President's attorney-client privilege as appropriate.

 Given the concerns that led us to conclude that a Deputy 
White House Counsel cannot rely on a government attorney-
client privilege to shield evidence from the grand jury, the 
Independent Counsel insists that it would be illogical for the 
court ever to allow the President's personal attorney-client 
privilege to shield government attorneys. While most parties 
could not expect that the use of a government official as an 
intermediary would provide an effective shield before a feder-
al grand jury, the President is not just any party. Although 
he cannot use the government attorney-client privilege to 
withhold his conversations with advisors from the grand jury, 
see supra section II.B, in order to have full and meaningful 
access to confidential counsel from his private attorneys, he 
must rely on aides. As one of his private attorneys told the 
district court, it is unrealistic to expect that the President can 
use a private party as an intermediary every time one is 
necessary: "the private individual can't just hop onto Air 
Force One and go off to Africa with the President and attend 
meetings and be in sessions and always be by his side the 
way a governmental official properly is." Such an arrange-
ment would not only be inconvenient, but might also pose 
security risks. Cf. In re Sealed Case (Secret Service), 148 
F.3d at 1075; Stigile v. Clinton, 110 F.3d 801, 803-04 (D.C. 
Cir. 1997). Moreover, forcing the President to go out of his 
way to find an appropriate intermediary would be insensitive 
to the Supreme Court's instruction that we pay "the utmost 
deference to Presidential responsibilities." Jones, 117 S. Ct. 
at 1652 (quoting Nixon, 418 U.S. at 710-11) (internal quota-
tion marks omitted). Certainly, the duty of the public official 
not to withhold information from the grand jury is usually 
paramount, see supra section II.B, but in light of the Presi-
dent's undisputed right to have an effective relationship with 


personal counsel, consonant with carrying out his official 
duties, we hold that the intermediary doctrine can still pro-
tect a government official when that official acts as a mere 
intermediary.

 B.

 The President also contends that Lindsey is within the 
protection of his personal attorney-client privilege under the 
"common interest" doctrine. As a usual rule, disclosure of 
attorney-client or work product confidences to third parties 
waives the protection of the relevant privileges; however, 
when the third party is a lawyer whose client shares an 
overlapping "common interest" with the primary client, the 
privileges may remain intact. See In re Sealed Case, 29 F.3d 
715, 719 (D.C. Cir. 1994); United States v. AT&T, 642 F.2d 
1285, 1300-01 (D.C. Cir. 1980). Finding that the President 
and the Office of the President do not share any legally 
cognizable common interest, the district court denied Lind-
sey's invocation of the President's personal attorney-client 
privilege through the common interest doctrine. The Presi-
dent contends that the district court erred and that Lindsey's 
interactions with the President's private counsel should be 
protected under the doctrine.15

 Although it has long been recognized that the President in 
his private persona shares some areas of common interest 
with the Office of the President, see, e.g., United States v. 
Burr, 25 F. Cas. 187, 191-92 (No. 14,694) (C.C.D. Va. 1807) 
(Marshall, C.J.), and although the Office of the President 
contends persuasively that the threat of impeachment, if 
nothing else, presents a common interest between the Presi-

__________
 15 Although the President contends that Lindsey also may claim 
the President's personal work product privilege for attorney work 
product prepared by or revealed to Lindsey about matters within 
the common interest of the President and the Office of the Presi-
dent, see AT&T, 642 F.2d at 1300-01, we fail to see how the 
question of the President's personal work product privilege was 
raised by the questions asked of Lindsey before the grand jury, and 
we thus decline to address this issue.

dent in his personal capacity and the Office of the President,16 
the existence of a common interest does not end our analysis.

 As we have established, government officials have responsi-
bilities not to withhold evidence relating to criminal offenses 
from the grand jury. See supra section II.B. The President 
cannot bring Lindsey within his personal attorney-client privi-
lege as he could a private citizen, for Lindsey is in a funda-
mentally different position. Unlike in his role as an interme-
diary, see supra section III.A, Lindsey necessarily acts as a 
government attorney functioning in his official capacity as 
Deputy White House Counsel in those instances when the 
common interest doctrine might apply, just as in those in-
stances when the government attorney-client privilege might 
apply. His obligation not to withhold relevant information 
acquired as a government attorney remains the same regard-
less of whether he acquired the information directly from the 
President or from the President's personal counsel. Thus, his 
status before the federal grand jury does not allow him to 
withhold evidence obtained in his official role under either the 
government attorney-client privilege or the President's per-
sonal attorney-client privilege applied through the common 
interest doctrine.

 If the President wishes to discuss matters jointly between 
his private counsel and his official counsel, he must do so 

__________
 16 Impeachment may remove the person, but no one could 
reasonably controvert that it affects the Office of the President as 
well. Even if there will always be a President and an Office of the 
President, it is unrealistic to posit that the Presidency will not be 
diminished by an impeachment. See, e.g., Michael Stokes Paulsen, 
The Most Dangerous Branch: Executive Power to Say What the 
Law Is, 83 Geo. L.J. 217, 323 (1994); see also William H. Rehnquist, 
The Impeachment Clause: A Wild Card in the Constitution, 
85 Nw. U. L. Rev. 903, 917-18 (1991). The possibility of impeach-
ment implicates institutional concerns of the White House, and 
White House Counsel, representing the Office of the President, 
would presumably play an important role in defending the institu-
tion of the Presidency.


cognizant of the differing responsibilities of the two counsel 
and tailor his communications appropriately; undoubtedly, his 
counsel are alert to this need as well. Although his personal 
counsel remain fully protected by the absolute attorney-client 
privilege, a Deputy White House Counsel like Lindsey may 
not assert an absolute privilege in the face of a grand jury 
subpoena, but only the more limited protection of executive 
privilege. Consequently, although the President in his per-
sonal capacity has at least some areas of common interest 
with the Office of the Presidency, and although there may 
thus be reason for official and personal counsel to confer, the 
overarching duties of Lindsey in his role as a government 
attorney prevent him from withholding information about 
possible criminal misconduct from the grand jury.

 IV.

 Accordingly, for the reasons stated in this opinion, we 
affirm in part and reverse in part.

 In accordance with the Supreme Court's expectation that 
"the Court of Appeals will proceed expeditiously to decide 
this case," Clinton, 118 S. Ct. at 2079, any petition for 
rehearing or suggestion for rehearing in banc shall be filed 
within seven days after the date of this decision.

 It is so ordered.

 Tatel, Circuit Judge, dissenting from Part II and concur-
ring in part and dissenting in part from Part III. The 
attorney-client privilege protects confidential communication 
between clients and their lawyers, whether those lawyers 
work for the private sector or for government. Although I 
have no doubt that government lawyers working in executive 
departments and agencies enjoy a reduced privilege in the 
face of grand jury subpoenas, I remain unconvinced that 
either "reason" or "experience" (the tools of Rule 501) justi-
fies this court's abrogation of the attorney-client privilege for 
lawyers serving the Presidency. This court's far-reaching 
ruling, moreover, may have been unnecessary to give this 
grand jury access to Bruce Lindsey's communications with 
the President, for on this record it is not clear whether those 
communications involved official legal advice that would be 
protected by the attorney-client privilege. Before limiting 
the attorney-client privilege not just for this President, but 
for all Presidents to come, the court should have first re-
manded this case to the district court to recall Lindsey to the 
grand jury to determine the precise nature of his communica-
tions with the President.

 I

 My colleagues and I have no disagreement concerning 
personal legal advice Lindsey may have given the President. 
We agree, and the White House concedes, that the official 
attorney-client privilege does not protect such communica-
tions, for as a White House employee Lindsey had no authori-
ty to provide such advice. Nor do we disagree about political 
advice given to the President by advisers who happen to be 
lawyers. Such advice is protected, if at all, by the executive 
privilege alone. Our disagreement centers solely on whether 
a grand jury can pierce the attorney-client privilege with 
respect to official legal advice that the Office of White House 
Counsel gives a sitting President.

 One of the oldest privileges at common law and " 'rooted in 
the imperative need for confidence and trust,' " Jaffee v. 
Redmond, 518 U.S. 1, 10 (1996) (quoting Trammel v. United 


States, 445 U.S. 40, 51 (1980)), the attorney-client privilege 
"encourage[s] 'full and frank communication between attor-
neys and their clients, and thereby promote[s] broader public 
interests in the observance of law and the administration of 
justice.' " Swidler & Berlin v. United States, 118 S. Ct. 2081, 
2084 (1998) (quoting Upjohn Co. v. United States, 449 U.S. 
383, 389 (1981)). The privilege protects client confidences even 
in the face of grand jury subpoenas. See id. at *2, *7.

 Government attorneys enjoy the attorney-client privilege in 
order to provide reliable legal advice to their governmental 
clients. "Unless applicable law otherwise provides, the 
attorney-client privilege extends to a communication of a 
governmental organization ... and of an individual officer ... 
of a governmental organization." Restatement (Third) of the 
Law Governing Lawyers ("Restatement") s 124 (Proposed 
Final Draft No. 1, 1996); see also Proposed Fed. R. Evid. 
503(a)(1), reprinted in 56 F.R.D. 183, 235 (1972). We have 
explained that where "the Government is dealing with its 
attorneys as would any private party seeking advice to pro-
tect personal interests, [it] needs the same assurance of 
confidentiality so it will not be deterred from full and frank 
communications with its counselors." Coastal States Gas 
Corp. v. Department of Energy, 617 F.2d 854, 863 (D.C. Cir. 
1980); see also Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C. 
Cir. 1997) ("Communications revealing ... client confidences 
[between IRS field personnel and IRS counsel regarding 
audit activity] ... are clearly covered by the attorney-client 
privilege....").

 This court now holds that for all government attorneys, 
including those advising a President, the attorney-client privi-
lege dissolves in the face of a grand jury subpoena. Accord-
ing to the court, its new rule "avoids the application of 
balancing tests to the attorney-client privilege--a practice 
recently criticized by the Supreme Court." Maj. Op. at 26. 
But whether a court abrogates the privilege by applying the 
balancing test rejected in Swidler, or by the rule the court 
adopts today, the chilling effect is precisely the same. 
Clients, in this case Presidents of the United States, will 


avoid confiding in their lawyers because they can never know 
whether the information they share, no matter how innocent, 
might some day become "pertinent to possible criminal viola-
tions," id. at 18. Rarely will White House counsel possess 
cold, hard facts about presidential wrongdoing that would 
create a strong public interest in disclosure, yet the very 
possibility that the confidence will be breached will chill 
communications. See Swidler, 118 S. Ct. at 2086-87. As a 
result, Presidents may well shift their trust on all but the 
most routine legal matters from White House counsel, who 
undertake to serve the Presidency, to private counsel who 
represent its occupant.

 Unlike Jaffee, 518 U.S. at 10-11 (recognizing a federal 
psychotherapy privilege), and In re Sealed Case, 148 F.3d 
1073, 1078-79 (D.C. Cir. 1998) (declining to recognize a 
protective function privilege for Secret Service agents), this 
case involves not the creation of a new privilege, but as in 
Swidler, the carving out of an exception to an already well-
established privilege. See Swidler, 118 S. Ct. at 2087-88. 
Denying that they are creating an exception, my colleagues 
say that they are "defining the particular contours of the 
government attorney-client privilege," Maj. Op. at 14, but no 
court has suggested that the attorney-client privilege must be 
extended client by client to each new governmental entity, 
proceeding by proceeding. Rather, "[u]nless applicable law 
otherwise provides," Restatement s 124, the privilege applies 
to all attorneys and all clients, regardless of their identities or 
the nature of the proceeding, see Swidler, 118 S. Ct. at 2087 
(finding no case authority for civil-criminal distinction). The 
question before us, then, is whether either "reason" or "expe-
rience" (Fed. R. Evid. 501), calls for exempting the Presiden-
cy from the traditional attorney-client relationship that all 
clients enjoy with their lawyers. See, e.g., Trammel, 445 U.S. 
at 48, 52 (curtailing spousal privilege based on majority trend 
in state law, the disappearance of "ancient" notions of the 
subordinate status of women, and the unpersuasiveness of 
arguments regarding privilege's effect on marital stability).


 As one of its reasons for abrogating the presidential 
attorney-client privilege, the court says that legal advice is no 
different from the advice a President receives from other 
advisers, advice protected only by executive privilege. Maj. 
Op. at 25-26. I think the court seriously underestimates the 
independent role and value of the attorney-client privilege. 
Unlike the executive privilege--a broad, constitutionally de-
rived privilege that protects frank debate between President 
and advisers, see United States v. Nixon, 418 U.S. 683, 708 
(1974); In re Sealed Case, 121 F.3d 729, 742-46 (D.C. Cir. 
1997)--the narrower attorney-client privilege flows not from 
the Constitution, but from the common law, see Swidler, 118 
S. Ct. at 2084. The attorney-client privilege does not protect 
general policy or political advice--even when given by law-
yers--but only communications with lawyers "for the purpose 
of obtaining legal assistance." Restatement s 122. Necessi-
tated by the nature of the lawyer's function, the 
attorney-client privilege enables the lawyer as an officer of 
the court properly to advise the client, including facilitating 
compliance with the law. See Upjohn, 449 U.S. at 389. In 
other words, the unique protection the law affords a Presi-
dent's communications with White House counsel rests not, as 
my colleagues put it, on some "conceit" that "lawyers are 
more important to the operations of government than all 
other officials," Maj. Op. at 26, but rather on the special 
nature of legal advice, and its special need for confidentiality, 
as recognized by centuries of common law. It therefore 
makes sense that the Presidency possesses both the attorney-
client and executive privileges, and that courts treat them 
differently.

 The court also cites 28 U.S.C. s 535(b). Although that 
statute generally supports qualifying--though not abrogat-
ing--the attorney-client privilege for government attorneys 
working in executive departments and agencies, the court 
acknowledges, as the Attorney General has told us in her 
amicus brief, that section 535(b) does not apply to the Office 
of the President. The court cites several statements, includ-
ing former White House Counsel Lloyd Cutler's speech to the 
New York Bar, the White House Travel Office Management 
Review, and the Administration's certiorari petition in In re 


Grand Jury Subpoena Duces Tecum, 112 F.3d 910 (8th Cir.), 
cert. denied, 117 S.Ct. 2482 (1997), indicating that White 
House lawyers comply with the spirit of section 535(b). Maj. 
Op. at 19-20. Nothing in those statements suggests, howev-
er, that their authors were referring to conversations between 
White House counsel and the President of the United States, 
i.e., that one presidential subordinate (White House counsel) 
would report a confidential conversation with a President to 
another presidential subordinate (the Attorney General). 
The court points to no other statutory basis for denying the 
President the benefit of the official privilege. Although the 
Independent Counsel statute ensures independent, aggressive 
prosecution of wrongdoing, nothing in that statute disables a 
President from defending himself or otherwise indicates that 
Congress intended to deprive the Presidency of its official 
privileges.

 The court refers to actions of a few previous White House 
counsel: Fred Buzhardt testified voluntarily before the Wa-
tergate grand jury; Peter Wallison turned over his diaries to 
the Iran-Contra investigation; and C. Boyden Gray and his 
deputy refused to be interviewed by that same Iran-Contra 
Independent Counsel. See Maj. Op. at 20-21. In my view, 
these limited and contradictory examples reveal nothing 
about the standard we should apply where, as here, a Presi-
dent of the United States actually invokes the attorney-client 
privilege in the face of a grand jury subpoena.

 Acknowledging the facial inapplicability of section 535(b) to 
the Office of the President, the court relies on the govern-
ment lawyer's oath of office for the proposition that White 
House counsel cannot have a traditional attorney-client rela-
tionship with the President. But all lawyers, whether they 
work within the government or the private sector, take an 
oath to uphold the Constitution of the United States. In 
order to practice before this court, for example, attorneys 
must promise to "demean [themselves] ... according to law 
... [and] support the Constitution of the United States." 
Application for Admission to Practice (U.S. Court of Appeals 
for the D.C. Circuit). No one would suggest that this oath 


abrogates a client's privilege in the face of a grand jury 
subpoena.

 This court's opinion, moreover, nowhere accounts for the 
unique nature of the Presidency, its unique need for confiden-
tial legal advice, or the possible consequences of abrogating 
the attorney-client privilege for a President's ability to obtain 
such advice. Elected, head of the Executive Branch, Com-
mander-in-Chief, head of State, and removable only by im-
peachment, the President is not just "a part of the federal 
government, consisting of government employees doing gov-
ernment business." Maj. Op. at 2. As Justice Robert H. 
Jackson observed in the steel seizure case, the Presidency 
concentrates executive authority "in a single head in whose 
choice the whole Nation has a part, making him the focus of 
public hopes and expectations. In drama, magnitude and 
finality his decisions so far overshadow any others that almost 
alone he fills the public eye and ear." Youngstown Sheet & 
Tube Co. v. Sawyer, 343 U.S. 579, 653 (1952) (Jackson, J., 
concurring). Echoing Justice Jackson three decades later, 
the Supreme Court emphasized in Nixon v. Fitzgerald, 457 
U.S. 731 (1982), that the President "occupies a unique position 
in the constitutional scheme," id. at 749, that we depend on 
the President for the "most sensitive and far-reaching deci-
sions entrusted to any official under our constitutional sys-
tem," id. at 752, and that the President's "unique status 
under the Constitution" distinguishes him from other execu-
tive branch officials, id. at 750. The Attorney General, 
focusing on the President's "singular responsibilities," de-
scribes the Presidency's critical need for legal advice as 
follows:

 The Constitution vests the President with unique, and 
 uniquely consequential, powers and responsibilities. The 
 Nation's "executive Power" is vested in him alone. U.S. 
 Const. Art. II, s 1. In addition to his significant and 
 diverse domestic and foreign affairs responsibilities, he is 
 specifically required to adhere to and follow the law, both 
 in his oath of office (Art. II, s 1, Cl. 8) and in the 
 requirement that "he shall take Care that the Laws be 


 faithfully executed." Art. II, s 3. To fulfill his manifold 
 duties and functions, the President must have access to 
 legal advice that is frank, fully informed, and confiden-
 tial. Because of the magnitude of the Nation's interest 
 in facilitating the President's conduct of his office in 
 accordance with law, the President's pressing need for 
 effective legal advice knows no parallel in government.

Amicus Br. at 24. By lumping the President together with 
tax collectors, passport application processors, and all other 
executive branch employees--even cabinet officers--the court 
bypasses the reasoned "case-by-case" analysis demanded by 
Rule 501, Jaffee, 518 U.S. at 8 (quoting S. Rep. No. 93-1277, at 
13 (1974)).

 A President's need for confidential legal advice may 
"know[] no parallel in government" for another reason. Be-
cause the Presidency is tied so tightly to the persona of its 
occupant, and because of what Fitzgerald referred to as the 
Presidency's increased "vulnerability," stemming from "the 
visibility of [the] office and the effect of [the President's] 
actions on countless people," Fitzgerald, 457 U.S. at 753, 
official matters--proper subjects for White House counsel 
consultation--often have personal implications for a Presi-
dent. Since for any President the line between official and 
personal can be both elusive and difficult to discern, I think 
Presidents need their official attorney-client privilege to per-
mit frank discussion not only of innocuous, routine issues, but 
also sensitive, embarrassing, or even potentially criminal top-
ics. The need for the official presidential attorney-client 
privilege seems particularly strong after Watergate which, 
while ushering in a new era of accountability and openness in 
the highest echelons of government, also increased the Presi-
dency's vulnerability. Aggressive press and congressional 
scrutiny, the personalization of politics, and the enactment of 
the Independent Counsel statute, Pub. L. No. 95-521, Tit. VI, 
92 Stat. 1824, 1867 (1978) (codified as amended at 28 U.S.C. 
ss 591-599 (1994))--which triggers appointment of an Inde-
pendent Counsel based on no more than the existence of 
"reasonable grounds to believe that further investigation is 
warranted," 28 U.S.C. s 592(c)(1)(A)--have combined to 

make the Supreme Court's fear that Presidents have become 
easy "target[s]," Fitzgerald, 457 U.S. at 753, truer than ever. 
No President can navigate the treacherous waters of post-
Watergate government, make controversial official legal deci-
sions, decide whether to invoke official privileges, or even 
know when he might need private counsel, without confiden-
tial legal advice. Because of the Presidency's enormous 
responsibilities, moreover, the nation has compelling reasons 
to ensure that Presidents are well defended against false or 
frivolous accusations that could interfere with their duties. 
The nation has equally compelling reasons for ensuring that 
Presidents are well advised on whether charges are serious 
enough to warrant private counsel. I doubt that White 
House counsel can perform any of these functions without the 
candor made possible by the attorney-client privilege. As I 
said at the outset, weakening the privilege may well cause 
Presidents to shift their trust from White House lawyers who 
have undertaken to serve the Presidency, to private lawyers 
who have not.

 Preserving the official presidential attorney-client privilege 
would not place the President above the law, as the Indepen-
dent Counsel implies. To begin with, by enabling clients--
including Presidents--to be candid with their lawyers and 
lawyers to advise clients confidentially, the attorney-client 
privilege promotes compliance with the law. See Upjohn, 449 
U.S. at 389. Independent Counsels, moreover, have powerful 
weapons to combat abuses of the attorney-client privilege. If 
evidence suggested that a President used White House coun-
sel to further a crime, the crime-fraud exception would abro-
gate the privilege. See United States v. Zolin, 491 U.S. 554, 
562-63 (1989). If an Independent Counsel had evidence that 
White House counsel's status as an attorney was used to 
protect non-legal materials from disclosure, those materials 
would not be protected. See State v. Philip Morris Inc., No. 
C1-94-8565, 1998 WL 257214, at *7 (Minn. Dist. Ct. Mar. 7, 
1998) (releasing documents as penalty for bad faith claim of 
privilege). "The privilege takes flight," Justice Benjamin 
Cardozo said, "if the [attorney-client] relation is abused." 
Clark v. United States, 289 U.S. 1, 15 (1933). Or if an 


Independent Counsel presented evidence that a White House 
counsel committed a crime, a grand jury could indict that 
lawyer. See George Lardner, Jr., Dean Guilty in Cover-Up: 
Nixon Ex-Aide Pleads to Count of Conspiracy, Wash. Post, 
Oct. 20, 1973, at A1. This Independent Counsel has never 
alleged that any of these abuses occurred.

 To be sure, a properly exercised attorney-client privilege 
may deny a grand jury access to information, see Swidler, 118 
S. Ct. at 2086 (justifying the burden placed on the truth-
seeking function by the privilege), but Presidents remain 
accountable in other ways, see Fitzgerald, 457 U.S. at 757 
(checks on Presidential action include impeachment, press 
scrutiny, congressional oversight, need to maintain prestige, 
and concern for historical stature). An Independent Counsel, 
moreover, can always report to Congress that a President has 
denied critical information to a grand jury. See 28 U.S.C. 
s 595(a)(2), (c). If the President continues to exercise his 
attorney-client privilege in the face of a congressional subpoe-
na, and if Congress believes that the President has committed 
"high Crimes and Misdemeanors," U.S. Const. art. II, s 4, 
Congress can always consider impeachment. See H. Rep. No. 
93-1305, at 4, 187-213 (1974) (recommending impeachment of 
President Nixon based on his refusal to turn over information 
in response to congressional subpoenas).

 II

 During Lindsey's several grand jury appearances he in-
voked both executive and attorney-client privileges, often with 
respect to the same questions. Now that the White House 
has dropped the executive privilege issue, much of that 
information may be available to the Independent Counsel and 
we have no way of knowing which questions, if any, Lindsey 
would continue to decline to answer. Even more fundamen-
tal, Lindsey's affidavit, his testimony and the affidavit of 
White House Counsel Charles F.C. Ruff suggest that the 
communications between Lindsey and the President regard-
ing the Monica Lewinsky and Paula Jones matters may have 
involved political and policy discussions, not legal advice. To 


be sure, the affidavits and Lindsey's testimony refer to advice 
about legal topics, such as invoking privileges and preparing 
for impeachment. But nowhere do they demonstrate that 
Lindsey rendered that advice in his capacity as a lawyer, i.e., 
that "the lawyer's professional skill and training would have 
value in the matter." Restatement s 122 cmt. b. A conver-
sation is not privileged merely because the President asked 
Lindsey a question about a nominally legal matter or in his 
capacity as White House Counsel staff. For example, if 
Lindsey advised the President about the political implications 
of invoking executive privilege, that communication would not 
be privileged; if he discussed the availability of the privilege 
as a legal matter, the conversation would be protected.

 Distinguishing between Lindsey's legal and non-legal ad-
vice becomes even more difficult because not only does Lind-
sey wear two hats, one legal (Deputy White House Counsel) 
and one non-legal (Special Assistant to the President), but the 
Office of White House Counsel has historically performed 
many non-legal functions, such as giving policy advice, writing 
speeches, and performing various political tasks. See Ste-
phen Hess, Organizing the Presidency 36, 43, 84 (1988); Lloyd 
N. Cutler, The Role of the Counsel to the President of the 
United States, 35 Record of the Association of the Bar of the 
City of New York 470, 472-76 (1980); Jeremy Rabkin, At the 
President's Side: The Role of the White House Counsel in 
Constitutional Policy, Law & Contemp. Probs., Autumn 1993, 
at 63, 65-76. When an advisor serves dual roles, the party 
invoking the privilege bears a particularly heavy burden of 
demonstrating that the services provided were in fact legal. 
See, e.g., Texaco Puerto Rico, Inc. v. Department of Consum-
er Affairs, 60 F.3d 867, 884 (1st Cir. 1995) (where agency 
"delegated policymaking authority to its outside counsel to 
such an extent that counsel ceased to function as lawyers and 
began to function as regulators," it could not invoke attorney-
client privilege); Restatement s 122 cmt. c (whether privi-
lege applies to lawyer acting in dual roles depends upon 
circumstances); cf. In re Sealed Case, 121 F.3d at 752 (with 
respect to " 'dual hat' presidential advisors, the government 


bears the burden of proving that the communications" are 
covered by the executive privilege).

 Accordingly, before abrogating the official attorney-client 
privilege for all future Presidents, this court should have 
remanded to the district court to allow the Independent 
Counsel to recall Lindsey to the grand jury to determine 
whether, with respect to each question that he declines to 
answer, he can demonstrate the elements of the attorney-
client privilege, namely that each communication was made 
between privileged persons in confidence "for the purpose of 
obtaining or providing legal assistance for the client," Re-
statement s 118. See United States v. Kovel, 296 F.2d 918, 
923 (2nd Cir. 1961) (remanding to permit accountant witness 
to offer factual support for assertion that communications 
were made in pursuit of legal advice). If Lindsey failed to 
meet this burden, that would end the matter, leaving for 
another day the difficult question of presidential attorney-
client privilege, with its consequences for the functioning of 
the Presidency, as well as its potential implications for possi-
ble impeachment proceedings (implications we have hardly 
begun to consider). See Maj. Op. at 23-25; Office of the 
President Br. at 26-29; Office of the Independent Counsel 
Br. at 35; cf. Amicus Br. at 34-37. On the other hand, if 
Lindsey demonstrated that his communications involved offi-
cial legal advice, the district court could use the remand to 
enrich the record by, for example, inviting former White 
House counsel to describe the nature of the relationship 
between Presidents and White House counsel generally and 
the role of the attorney-client privilege in particular. This 
would create an infinitely more useful record for us, or 
eventually the Supreme Court, to determine whether reason 
or experience justifies any change in the official presidential 
attorney-client privilege, and if so, whether the privilege can 
be modified without threatening a President's ability to "take 
Care that the Laws be faithfully executed." U.S. Const. art. 
II, s 3. See Swidler, 118 S. Ct. at 2087 n.4 (noting lack of 
empirical evidence in support of limiting the privilege); Jaf-
fee, 518 U.S. at 16 & n.16 (relying on amicus briefs citing 
psychology and social work studies); Trammel, 445 U.S. at 


48, 52 (relying on historical developments regarding the role 
of women in marriage).

 I do not consider the Supreme Court's expectation that we 
proceed expeditiously to be inconsistent with our obligation to 
engage in fully reasoned and informed decision-making. The 
importance to the Presidency of effective legal advice re-
quires no less. Moreover, according to the Independent 
Counsel, the grand jury is exploring whether obstruction of 
justice, perjury, witness intimidation, and other crimes were 
committed in January 1998. See 18 U.S.C. s 3282 (establish-
ing five-year statute of limitations for non-capital federal 
crimes). We thus have time to determine whether we need to 
resolve this important question and, if so, to ensure that we 
do so on the basis of a fuller, more useful record. If the 
Independent Counsel needs to report to Congress more expe-
ditiously, he is free to do so.

 III

 I concur in Part III.A of the court's opinion. For the 
reasons stated in Parts I and II of my published dissent, I 
cannot join Part III.B. Since I believe that the Presidency's 
confidential attorney-client privilege covers communications 
with White House counsel, I would hold that the common 
interest doctrine protects communications between White 
House counsel and a President's private counsel where the 
attorneys share an overlapping common interest.